UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MARGARETTE DUVERGER, individually, and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>ROBERT SLACK, LLC, a Florida limited liability company<br><br>     Defendant. | NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

  This case addresses a disturbing trend whereby realty brokerages train their agents to cold call consumers without consent in violation of the Telephone Consumer Protection Act. Plaintiff Margarette Duverger ("Duverger") brings this Class Action Complaint against Defendant Robert Slack, LLC ("Robert Slack") to stop the Defendant from violating the Telephone Consumer Protection Act by training its agents to make solicitation calls *without consent* to consumers using a pre-recorded voice message. Plaintiff Duverger, for this Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

**PARTIES**

  1. Plaintiff Margarette Duverger is a resident of Miramar, Florida.

  2. Defendant Robert Slack, LLC is a realty brokerage located in Ocala, Florida.

**JURISDICTION AND VENUE**

  3. This Court has personal jurisdiction over Defendant and venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's wrongful conduct of calling the Plaintiff was directed to and received by Plaintiff in this District.

## INTRODUCTION

4. As the Supreme Court explained at the end of its last term, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am. Ass'n of Political Consultants*, No. 19-631, 2020 U.S. LEXIS 3544, at *5 (U.S. July 6, 2020).

5. When Congress enacted the TCPA in 1991, it found that telemarketers called more than 18 million Americans every day. 105 Stat. 2394 at § 2(3).

6. By 2003, due to more powerful autodialing technology, telemarketers were calling 104 million Americans every day. In re Rules and Regulations Implementing the TCPA of 1991, 18 FCC Rcd. 14014, ¶¶ 2, 8 (2003).

7. The problems Congress identified when it enacted the TCPA have only grown exponentially in recent years.

8. According to online robocall tracking service "YouMail," 4.9 billion robocalls were placed in March 2021 alone, at a rate of 159.4 million per day. www.robocallindex.com (last visited April 6, 2021).

9. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), statement of FCC chairman.[1]

10. "The FTC receives more complains about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer

---

[1] https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls

Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).[2]

## COMMON ALLEGATIONS

11. Robert Slack is a real estate brokerage.

12. Robert Slack divides their realtors into teams and provides each team with a dedicated team leader who presents weekly training sessions and quarterly one-on-one sessions. The team leader reports directly to the CEO, Robert Slack.

13. Robert Slack draws many agents to its brokerage because it is willing to provide its realtors with leads and training to market to new leads. In exchange, the realtors are willing to take less in their commission splits with the brokerage since they are gaining an ongoing stream of leads from Robert Slack and the technology to call them.

14. Robert Slack also provides its realtors with the technology to store those leads and make calls to them.

15. Robert Slack provides its agents with Follow Up Boss, a CRM system and CallAction, a calling software that integrates with Follow Up Boss.

16. Follow Up Boss provides a dashboard for Robert Slack realtors whereby they can systematically call or text all leads in their system daily and their dedicated team leaders can access their Follow Up Boss account to see all of their calling activity.

17. Robert Slack provides its realtors with training and online courses teaching them how to find the leads, how to call them, and what to say on the call turning them from a lead into a client.

18. One of the features of Follow Up Boss (provided to Robert Slack realtors) is that it integrates with a popular high-quality lead generation and calling platform called Mojo.

---

[2] https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf

3

19. Through Mojo, realtors can purchase expired and off-market leads with hard to find contact information -- *i.e.*, phone numbers of consumers who never gave consent to be called by realtors. In fact, Mojo advertises that it uses skip tracing technology to locate phone numbers of individuals associated with properties.

20. Robert Slack realtors use Mojo's lead data information to create lead lists to call.

21. Mojo also includes a dialer with the ability to leave prerecorded voice messages like the one the Plaintiff received.

22. Robert Slack team leaders are aware that some of the realtors on their team use Mojo to generate and call leads, including by leaving prerecorded voice messages as part of their marketing campaigns.

23. Robert Slack tracks each realtor's lead generation activities through their Follow Up Boss account. Inside Follow Up Boss, the team leader and Robert Slack can see how many calls a realtor made on a daily or weekly level, the number of calls connected, the number of conversations, the total talk time, and other relevant metrics.

24. According to Robert Slack, the owner of Robert Slack, he has hired an accountability person to "every day sit at a desk and pour over everybody's Follow Up Boss to make sure they are being accountable, and if they are not, they will [be] accountable to me [Robert Slack]."[3] Since Follow Up Boss is integrated with Mojo, Robert Slack's accountability person, team leader, and others at Robert Slack have the knowledge that realtors are using Mojo to generate and make prerecorded cold calls to clients using Mojo leads.

25. As Follow Up Boss' documentation provides "Sync leads from Mojo to Follow Up Boss…Any call made in Mojo to a synced lead will transfer over to Follow Up Boss as a Call Log."[4] The data including voicemail messages are synced to Follow Up Boss.[5] Thus, if Defendant's team leader, Robert Slack, or Robert Slack's accountability person track each

---

[3] https://www.youtube.com/watch?v=16q02TPK_Qg&t=1100s min 35
[4] https://help.followupboss.com/360002584994-Phone-Texting/360014277213-Mojo-Sells-Integration
[5] https://www.youtube.com/watch?v=SkXUNEna_Ns min 11min 11

4

agents' Follow Up Boss account to make sure they are keeping up with the expected daily calling activities, they know or should know that agents are making cold calls to Mojo leads including prerecorded voice message calls.

## PLAINTIFF'S ALLEGATIONS

26. Andres Vieira ("Vieira") was a fulltime real estate salesperson for Defendant Robert Slack, from 2018 through February 2021.

27. Vieira chose to work at Robert Slack in part due to their extensive lead generation training, leads that they provide to realtors, their technology including Follow Up Boss, and other tools available to their real estate sales persons.

28. Vieira chose to work at Robert Slack in exchange for a lower commission split because of the training and coaching provided at Robert Slack.

29. Defendant Robert Slack provided Vieira with Realtor.com leads and Follow Up Boss as a CRM system that allowed him to make outbound lead generation calls and track all of his daily lead and calling activity.

30. Vieira purchased the Mojo dialer and Mojo leads because of the integration with the Follow Up Boss system provided by Defendant Robert Slack.

31. Vieira's team leader at Robert Slack was aware of how Vieira generated his leads through Mojo. Vieira's team leader would teach Robert Slack agents when to call leads, how best to engage them, and how frequently to call them. In addition, Defendant Robert Slack provided scripts through its training portal which Vieira used to make the calls.

32. On information and belief, Vieira's team leader and Defendant Robert Slack had full access to Vieira's Follow Up Boss call system which indicated the calls to Mojo leads, including calls made using a prerecorded voice.

33. On November 28, 2020 at approximately 2:00 PM, Plaintiff Duverger received an unsolicited call from the Robert Slack salesperson Andres Vieira to her cell phone from the phone number 305-982-7893.

34. Plaintiff did not answer this call, but a prerecorded voice message was left on Plaintiff's cell phone voicemail from Andres Vieira, a Robert Slack sales person.

35. The pre-recorded message was left by Vieira with regards to whether Plaintiff is interested in engaging Vieira to assist in buying or selling her property.

36. In the pre-recorded message, Vieira identifies himself as a realtor in Palm Springs North and asks Plaintiff to call him back to the phone number 786-973-0860.

37. Plaintiff Duverger never provided her phone number to Vieira, to Defendant Robert Slack, or any of its other agents.

38. The unauthorized solicitation telephone call that Plaintiff received from Vieira, a Robert Slack salesperson, as alleged herein, has harmed Plaintiff Duverger in the form of annoyance, nuisance, and invasion of privacy, and disturbed the use and enjoyment of her phone, in addition to the wear and tear on the phone's hardware (including the phone's battery) and the consumption of memory on the phone.

39. Seeking redress for these injuries, Plaintiff Duverger, on behalf of herself and a Class of similarly situated individuals, bring suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, which prohibits unsolicited prerecorded telemarketing calls to cellular telephones.

## CLASS ALLEGATIONS

40. Plaintiff Duverger brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and seek certification of the following Class:

> **Pre-recorded No Consent Class:** All persons in the United States who from four years prior to the filing of this action through class certification (1) an agent acting on behalf of Defendant called on their cell phone number (2) using a pre-recorded voice message, and (3) for whom the Defendant or its agents claim they obtained the person's cell phone number in the same manner they obtained the Plaintiff's cell phone number.

41. The following individuals are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, their subsidiaries, parents, successors, predecessors, and any entity in which either Defendant or its

6

parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Defendant have been fully and finally adjudicated and/or released. Plaintiff Duverger anticipates the need to amend the Class definitions following appropriate discovery.

42. **Numerosity**: On information and belief, there are hundreds, if not thousands of members of the Class such that joinder of all members is impracticable.

43. **Commonality and Predominance**: There are many questions of law and fact common to the claims of the Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

(a) whether Defendant's agent systematically placed pre-recorded voice message solicitation calls to consumers without first obtaining consent to make the calls;

(b) whether Defendant is vicariously liable for the calls made by its realtors;

(c) whether Defendant's conduct constitutes a violation of the TCPA;

(d) whether members of the Class are entitled to treble damages based on the willfulness of Defendant's conduct.

44. **Adequate Representation**: Plaintiff Duverger will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in class actions. Plaintiff Duverger has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff Duverger and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff Duverger nor her counsel have any interest adverse to the Class.

45. **Appropriateness**: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class and as a

whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final class-wide injunctive relief appropriate. Defendant's business practices apply to and affect the members of the Class uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as wholes, not on facts or law applicable only to Plaintiff Duverger. Additionally, the damages suffered by individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the members of the Class to obtain effective relief from Defendant's misconduct on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff Duverger and the Pre-recorded No Consent Class)**

46. Plaintiff repeats and realleges the prior paragraphs of this Complaint and incorporates them by reference herein.

47. Defendant's agents transmitted unwanted solicitation telephone calls to Plaintiff Duverger and the other members of the Pre-recorded No Consent Class using a pre-recorded voice message.

48. These pre-recorded voice calls were made *en masse* without the prior express written consent of the Plaintiff Duverger and the other members of the Pre-recorded No Consent Class.

49. Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's conduct, Plaintiff Duverger and the other members of the Pre-recorded No Consent Class are each entitled to a minimum of $500 in damages, and up to $1,500 in damages, for each violation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Duverger individually and on behalf of the Class, prays for the following relief:

50. An order certifying this case as a class action on behalf of the Class as defined above; appointing Plaintiff Duverger as the representative of the Class; and appointing her attorneys as Class Counsel;

51. An award of actual and/or statutory damages and costs;

52. An order declaring that Defendant's actions, as set out above, violate the TCPA;

53. An injunction requiring Defendant to cease all unsolicited calling activity, and to otherwise protect the interests of the Class; and

54. Such further and other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Duverger requests a jury trial.

Respectfully Submitted,

**MARGARETTE DUVERGER,** individually and on behalf of those similarly situated,

DATED this 28th day of April, 2021.

By: /s/ Stefan Coleman
Stefan Coleman (FL Bar no. 30188)
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, P.A.
201 S. Biscayne Blvd, 28th Floor
Miami, FL 33131
Telephone: (877) 333-9427
Facsimile: (888) 498-8946

Avi R. Kaufman (FL Bar no. 84382)
kaufman@kaufmanpa.com
KAUFMAN P.A.
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

*Attorneys for Plaintiff and the putative Class*